Arline White SMITH, Plaintiff,

v.

ALLSTATE INSURANCE
CORPORATION,
Defendant.

No. 96 C 7029.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 23, 1998.

872

Danielle Lisa Weiss, Claudia Oney, Claudia Oney, P.C., Chicago, IL, for plaintiff.

Arline White Smith, Olympic Fields, IL, pro se.

Oswald Gregory Lewis, Hubert O. Thompson, Brothers & Thompson, P.C., Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiff, Arline White Smith, filed a five-count Second Amended Complaint against the defendant, Allstate Insurance Corporation ("Allstate"), bringing claims under Title VII, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1). Ms. Smith alleges that Allstate, by failing to promote her on several occasions, discriminated against her on the basis of her race, sex, and age and retaliated against her for filing charges of discrimination. She further alleges that Allstate pays her less than men for the same work. Allstate moves for summary judgment on all counts. For the reasons set forth below, Allstate's motion is granted.

### Background

The following facts are undisputed: Ms. Smith is a forty-seven year old African American woman. (12(M) St. ¶ 1). She has been employed by Allstate since 1973 and since March, 1993, has been working in Allstate's Matteson, Illinois claims office. (*Id.* ¶¶ 1–2). When she was transferred to the Matteson office from the Oak Lawn office, she became a Claim Unit Manager. (*Id.* ¶ 2). In mid 1995, she was promoted to her current position of Evaluation Consultant ("EC"). (*Id.* ¶¶ 1, 5). As an EC, Ms. Smith evaluates the dollar value of bodily injury claims as submitted by claim representatives and authorizes settlement amounts. (*Id.* ¶ 6).

Each job title at Allstate is classified into a salary grade that reflects the ranking of the job within the company. (*Id.* ¶ 9). Salary ranges within each grade are from 80% to 120% of the mid-point. (*Id.*). The EC position is a salary grade 35. (*Id.*). The Casualty Claim Manager ("CCM") position is a salary grade 37. (*Id.* ¶ 95). By job description, the CCM does not directly supervise anybody but is nevertheless a tremendous influence in the office. (*Id.* ¶ 90). When the Market Claim Manager ("MCM") is out, the CCM replaces him or her. (*Id.*). The CCM also conducts training in the office. (*Id.*).

On February 1, 1994, Ms. Smith was denied a promotion to CCM and it was announced that Olga Rivera would receive the promotion. (*Id.* ¶ 20). On that same day, Ms. Smith and Ms. Rivera had a conversation concerning the promotion. (*Id.* ¶ 21). Ms. Smith told Ms. Rivera that she was disappointed that she had not received the promotion and that she would do what she had to do to have the matter resolved. (*Id.*).

In March, 1994, a CCM opening occurred in the Arlington Heights office. (*Id.* ¶ 23). The MCM for that office was Frank Popolo. (*Id.*). Mr. Popolo's superior was the Territorial Claim Manager ("TCM"), Richard Hayne. (*Id.*). Mr. Popolo testified that when openings occurred within his office, he would attempt to fill them with someone from within the office because it was good for morale and it created another opening within the office. (*Id.* ¶ 24). He further testified that if there were no qualified persons within his office, he would talk to his superior and discuss other available candidates. (*Id.* ¶ 25). Mr. Popolo recommended Kathy Gaitan, a licensed attorney, for the CCM position. (*Id.* ¶¶ 26–27). Mr. Hayne testified that he gave great weight to Mr. Popolo's recommendation. (*Id.* ¶ 26). He made the ultimate decision to promote Ms. Gaitan to the CCM position. (*Id.* ¶ 27).

Ms. Gaitan was a Casualty Unit Manager in the Arlington Heights office at the time of her promotion. (*Id.* ¶ 28). She is white and at that time, was 34 or 35 years old. (*Id.* ¶ 31). She had been hired by Allstate into a special program that sought to recruit and promote attorneys in the claims department.[1] (*Id.* ¶ 28). Ms. Smith had never worked in Arlington Heights and had never worked for Mr. Popolo. (*Id.* ¶ 30).

Michael Seal was appointed to the position of CCM in the Arlington Heights office around June, 1996. (*Id.* ¶¶ 19, 32–33). Sheryl Thomas Bluitt, the Claim Service Manager ("CSM"), was the decisionmaker concerning Mr. Seal's appointment. (*Id.* ¶ 32). Mr. Seal's previous position was a grade 37 position at Tech Cor. (*Id.* ¶ 33). Tech Cor is a training facility for Allstate where training

and development processes for the company are created. (*Id.* ¶ 36).

In May, 1996, John Pieroth was asked to step down from his position of CCM to become an EC in the Matteson office. (*Id.* ¶¶ 95–96). Although the EC position was in a lower salary grade than the CCM position, Mr. Pieroth retained his CCM salary. (*Id.* ¶ 95).

The MCM of the Matteson office, Sam Tornabene, recommended John Valaitis for the position of CCM to replace Mr. Pieroth. (*Id.* ¶¶ 49, 68, 96). Mr. Tornabene wanted an experienced CCM at that time and felt fortunate to get Mr. Valaitis given his many years of experience as a CCM. (*Id.* ¶ 68). Mr. Valaitis had a proven track record as a CCM. (*Id.*). The appointment of Mr. Valaitis to CCM was not a promotion but a lateral move. (*Id.* ¶ 69).

Mr. Tornabene subsequently recommended Collette Thomas, an African American woman, for another CCM position around August, 1997. (*Id.* ¶¶ 19, 70). Ms. Thomas displayed the ability to take on tasks beyond her responsibilities of managing a unit of 12 to 14 employees. (*Id.* ¶ 71). Ms. Thomas volunteered to go to Seattle, Washington and be the facilitator for the auto casualty claim process redesign implementation. (*Id.*). Mr. Tornabene felt that Ms. Thomas did an outstanding job with the implementation. (*Id.*). Paul Huber, the CSM to whom Mr. Tornabene reported, made the final decision to promote Ms. Thomas to the CCM position.· (*Id.* ¶¶ 76–77, 79).

In September, 1997, Mr. Huber promoted Patrick Fitzpatrick to the position of CCM. (*Id.* ¶¶ 19, 79). Mr. Huber testified that he promoted Mr. Fitzpatrick to the CCM position because he felt that Mr. Fitzpatrick was the best person for the job. (*Id.* ¶ 94). He further testified that he believed Ms. Smith was not qualified to be promoted to the position of CCM because she lacked leadership skills. (*Id.* ¶ 91).

Ms. Smith claims that she was illegally discriminated and/or retaliated against when

---

1. Because the claims department regularly dealt with personal injury and property damage claims and with the attorneys representing plaintiffs re-

garding such claims, persons with legal training in Allstate's claims department were highly valued. (12(M) St. ¶ 28).

she failed to receive the above promotions to the position of CCM received by Ms. Rivera, Ms. Gaitan, Mr. Seal, Mr. Valaitis, Ms. Thomas, and Mr. Fitzpatrick.[2] Ms. Smith also claims that Allstate violated the EPA by paying six male employees more than her for equal work: Mr. Pieroth, Mr. Seal, Anthony Soskich, Harold Landt, Robert Nugent, and Jon Wojicomski.

*February 1, 1994 Promotion of Olga Rivera*

Ms. Smith claims that she was illegally discriminated against on the basis of her race and age when she was denied the promotion received by Ms. Rivera on February 1, 1994. Allstate argues that this claim is time barred because Ms. Smith did not file her charge of discrimination within 300 days of the denial of the promotion. Under Title VII and the ADEA, Ms. Smith had up to 300 days to file a charge with the EEOC since she resides in Illinois, a state which has an agency authorized to grant relief from unlawful employment practices. *See Gilardi v. Schroeder,* 833 F.2d 1226, 1230 (7th Cir.1987) (interpreting 42 U.S.C. § 2000e–5(e)(1)); 29 U.S.C. §§ 626(d), 633(b) (stating that the plaintiff has 300 days to file where a state has an agency authorized to grant relief). Ms. Smith filed her EEOC charge on December 20, 1994, more than 300 days after the alleged discriminatory action. Because Ms. Smith did not file a timely charge with regards to this claim, she cannot bring suit under either Title VII or the ADEA. *See Movement for Opportunity & Equality v. General Motors Corp.,* 622 F.2d 1235, 1240 (7th Cir.1980) (stating that plaintiffs must file a charge with the EEOC to bring a suit under Title VII); 29 U.S.C. § 626(d) ("No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC].").

Ms. Smith responds that she in fact notified the EEOC of her initial charge, charge no. 210950889, on November 23, 1994, when she caused a written copy of the charge to be hand delivered to the EEOC.[3] Ms. Smith states that the date in her complaint is merely the date on which the EEOC prepared a copy of the charge and not the actual filing date. By stating in her Second Amended Complaint that "a charge of discrimination was filed with the [EEOC] on December 20, 1994," however, Ms. Smith is precluded from retracting that date and stating a new date.[4] "It is a well-settled rule that a party is bound by what it states in its pleadings." *Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997).

In the alternative, Ms. Smith contends that her claim is not time barred under the continuing violation doctrine. There are three different continuing violation theories: (1) an employer's decisionmaking process takes place over a period of time such that it is difficult to determine the date of the discriminatory act; (2) an employer has an express, openly espoused discriminatory policy; and (3) an employer covertly follows a practice of discrimination over a period of time. *Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1058 (7th Cir.1994). Ms. Smith knew on February 1, 1994 that she did not receive the promotion, so the first theory is to no avail. The second theory is also unavailable since Ms. Smith has not alleged nor has she presented any evidence that Allstate had an explicit, clearly conveyed policy of discriminating against African Americans or

2. In Ms. Smith's answer to interrogatories, she stated that she believed she was discriminated against when Michael Kane received the promotion to the position of MCM in December, 1997. In both Ms. Smith's Second Amended Complaint and her charges with the Equal Employment Opportunity Commission ("EEOC"), however, she only alleges discrimination due to Allstate's failure to promote her to the position of CCM, a position that reports to the MCM. Furthermore, Ms. Smith has not filed a charge of discrimination in relation to this promotion (the last charge attached to her complaint was filed on September 26, 1997). Thus, any discrimination with regard to Mr. Kane's promotion is not properly before this court.

3. Although Ms. Smith states in her affidavit that she asked a friend to hand deliver her charge to the EEOC on November 23, 1994 and that her friend received a file stamp showing that date, Ms. Smith did not attach that charge. (*See* Smith Aff. ¶ 34, Pl.'s Ex. 1).

4. The charge that Ms. Smith attached to her Second Complaint is in fact dated December 20, 1994.

older persons in promotion decisions. Thus, this claim can only survive if it falls under the third continuing violation theory.

The rationale behind the third theory is that by engaging in a covert practice of discrimination, the plaintiff could not realize that she was a victim of discrimination until after a series of discrete acts had occurred. *Id.* The limitations period does not begin to run until the plaintiff gains such insight. *Id.* "However, if the plaintiff knew, or 'with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed' her," she must file within the relevant limitations period. *Id.* (quoting *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 282 (7th Cir.1993)).

■ In this case, it is undisputed that Ms. Smith knew about Ms. Rivera's promotion on February 1, 1994. Ms. Smith had a conversation with Ms. Rivera on that date concerning the promotion. Ms. Smith told Ms. Rivera that she was disappointed that she did not receive the promotion and that she would do what she had to do to have the matter resolved. At that time, Ms. Smith either knew or with the exercise of reasonable diligence would have known that the failure to promote her was discriminatory. Accordingly, summary judgment on this claim is granted.

### Promotion of Kathy Gaitan

Ms. Smith alleges that Allstate discriminated against her on the basis of her race and age by promoting Ms. Gaitan instead of her in March, 1994 to the position of CCM in the Arlington Heights office. To prove discrimination under Title VII or the ADEA in the absence of direct evidence, a plaintiff may use the burden-shifting method established in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 889 (7th Cir. 1997) (stating that age discrimination may be proved through direct proof of discrimination or through the indirect, burden-shifting method of proof established in *McDonnell Douglas* for Title VII cases). First the plaintiff must establish a *prima facie* case. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If successful, the burden of production shifts to the employer to articulate a legiti-

mate, nondiscriminatory reason for its action. *Id.* If the employer articulates such a reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason was a pretext for discrimination. *Id.* at 804, 93 S.Ct. 1817. For purposes of this claim, Allstate assumes that Ms. Smith can establish a *prima facie* case of discrimination.

■ Allstate argues that it has articulated legitimate nondiscriminatory reasons for promoting Ms. Gaitan and not promoting Ms. Smith. It states that the MCM for the Arlington Heights office at the time of the promotion, Mr. Popolo, recommended Ms. Gaitan for the promotion. His recommendation was based on three factors: (1) Ms. Gaitan was a current employee of the Arlington Heights office and where possible, Mr. Popolo tried to fill an opening from within the office to increase office morale and to create another opening in the office; (2) Ms. Gaitan worked for Mr. Popolo and he knew her capabilities while he did not know Ms. Smith's capabilities because she worked in the Matteson office; and (3) Ms. Gaitan was a licensed attorney which was highly valued in the claims department. Mr. Hayne, the TCM and Mr. Popolo's superior, gave great weight to Mr. Popolo's recommendation and agreed to Ms. Gaitan's promotion.

Ms. Smith responds that the articulated reasons are pretext for race and age discrimination. She claims that there is no evidence of a preference for promotion from within as illustrated by the fact that four of the other alleged discriminatory promotions to CCM involved transfers between offices: Mr. Valaitis from Lombard to Matteson, Mr. Seal from Tech Cor to Arlington Heights, Ms. Thomas from Matteson to Lombard, and Mr. Fitzpatrick from Wisconsin to Arlington Heights. The problem with this argument is the decisionmakers as to those promotions were not Mr. Popolo or Mr. Hayne. To demonstrate pretext, Ms. Smith must focus on the specific decisionmakers at issue. *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1366 (7th Cir.1988). She has not presented any evidence to rebut Mr. Popolo's stated reason that he preferred to promote from within his office.

Ms. Smith then argues that Mr. Popolo's statement that he did not know her is not worthy of credence. She states that William Rathe, the Human Resources Manager, held meetings from 1989 to 1996 to discuss candidates for promotion in all the offices and that Mr. Rathe produced documents to inform managers about the candidates. She claims that Mr. Popolo as well as Thomas Cuchra, a TCM who thought she was qualified for a promotion, would have attended those meetings. Ms. Smith, however, has not presented any evidence that Mr. Popolo attended those meetings, that Mr. Cuchra attended those meetings, that they both were in attendance at the same time, that Mr. Cuchra thought she was qualified, or that she was discussed at any of these meetings. Furthermore, even if there was such evidence, it does not contradict Mr. Popolo's statement that he promoted Ms. Gaitan because he knew her capabilities since she worked in his office under his supervision while he did not know of Ms. Smith's capabilities because she worked in a different office.

Finally, Ms. Smith argues that Mr. Popolo's claim that he promoted Ms. Gaitan because she was a lawyer is not worthy of credence because the CCM job description does not call for a law degree nor does it even state a preference for one and lawyers were not sought out to be CCMs. To the contrary, there is evidence that Allstate was trying to place qualified lawyers into the claims department. It is undisputed that persons with legal training in Allstate's claims department were highly valued because the claims department regularly dealt with personal injury and property damage claims and with attorneys representing plaintiffs regarding such concerns. It is also undisputed that Ms. Gaitan had been hired by Allstate into a special program that sought to recruit and promote attorneys in the claims department. Thus, summary judgment is granted on this claim.

### Promotion of John Valaitis

Allstate contends that Ms. Smith is unable to establish a *prima facie* case of discrimination as to Mr. Valaitis' promotion: that [she] is a member of a protected group, that [she] applied for and was qualified for the position sought, that [Allstate] rejected [her] for the position, and that [Allstate] granted that promotion to a person whose race ... [or sex or age] was different from that of [Ms. Smith] but whose qualifications were similar or less than those of [Ms. Smith].

*Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472–73 (7th Cir.1993), *cert. denied*, 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993). Allstate argues that Ms. Smith must show that someone else was promoted into the position and that showing someone else was laterally transferred into the position is insufficient to establish the fourth prong. It argues that because Mr. Valaitis was laterally transferred and not promoted into the position, Ms. Smith has not established her *prima facie* case.

This argument is without merit. There is no rational basis for making a distinction between a promotion and a transfer. Whether or not Mr. Valaitis was promoted to or transferred into the CCM position, it does not change the fact that someone else received the position for which Ms. Smith applied and was qualified. The fact that someone of similar qualifications outside of the protected class received the position that Ms. Smith applied for and was qualified for is sufficient to create an inference that the decision not to promote Ms. Smith was based on an illegal discriminatory criterion. *Leffel v. Valley Financial Services*, 113 F.3d 787 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997).

In the alternative, Allstate contends that Ms. Smith was not hired for the position because Mr. Tornabene wanted a person experienced as a CCM for the open CCM position in Matteson. Ms. Smith argues that this reason is pretext because CCM experience is not in the CCM job description. A manager, however, can want someone with experience over someone who is inexperienced even if the job description does not specifically require experience. What Ms. Smith must demonstrate is that the manager's stated desire for experience is pretext. Ms. Smith has not presented any evidence to support pretext; in fact, she does not cite to a single fact from the 12(M) Statement, her 12(N) Response, or her 411 paragraph 12(N) State-

ment of Additional Facts. Rather, it is undisputed that Mr. Tornabene wanted an experienced CCM and that Mr. Valaitis had those qualifications. Summary judgment is therefore granted on this claim.

### Promotion of Michael Seal

Initially, Allstate argues that Ms. Smith has not established her *prima facie* case of discrimination because Mr. Seal did not receive a promotion when he became CCM. For the reasons stated above, this argument lacks merit.

■ Allstate then states that Ms. Bluitt, the decisionmaker in this instance, gave Mr. Seal the CCM position for budgetary reasons. Because Mr. Seal was already a grade 37, his appointment to the CCM position, which is also a grade 37, would have no budgetary impact. She also felt that Mr. Seal had certain leadership abilities and substantive experiences that Ms. Smith lacked. In particular, Mr. Seal had taught Claim Core Process Redesign ("CCPR") at Tech Cor, a new process that Allstate was implementing. Since many employees of the Arlington Heights office were resistant to CCPR, Ms. Bluitt believed that Mr. Seal could lead them through the process of understanding and accepting CCPR. Ms. Bluitt did not consider Ms. Smith because she was resistant to many of the changes that were part of CCPR.

It is unclear why the promotion of Mr. Seal had no budgetary impact. If Ms. Bluitt was concerned with the company-wide budget the only way Mr. Seal's appointment could assist the budget is if Allstate eliminated his position at Tech Cor. No such evidence was presented. Without more explanation and evidence, this reason appears pretextual.

Ms. Smith did not respond to Allstate's second reason for promoting Mr. Seal in her memorandum of law. In her 12(N) Response, she does deny that Ms. Bluitt thought she was resistant to CCPR, citing to Ms. Bluitt's deposition. (12(N) Resp. ¶¶ 38–39). The deposition cites, however, do not support Ms. Smith's denial. Furthermore, Ms. Smith has not refuted the fact that All-

state was implementing CCPR, that Mr. Seal taught CCPR at Tech Cor, or that the Arlington Heights employees were resistant to CCPR. Consequently, I do not find this reason pretextual. "If at least one reason remains unquestioned which, standing alone, would have caused [Allstate] to take the challenged action, then summary judgment [is] proper." *Sample v. Aldi Inc.*, 61 F.3d 544, 549 (7th Cir.1995).

### Promotions of Collette Thomas and Patrick Fitzpatrick

■ Around August and September, 1997, Allstate promoted Ms. Thomas and Mr. Fitzpatrick respectively to the CCM position. Ms. Smith claims that she was not promoted in retaliation for filing charges of discrimination. Allstate moves for summary judgment on the ground that it had a legitimate, nondiscriminatory reason for not promoting Ms. Smith which cannot be rebutted as pretextual.[5]

Allstate claims that Ms. Thomas and Mr. Fitzpatrick were promoted to CCM over Ms. Smith because their supervisor, Mr. Tornabene, would not recommend Ms. Smith for promotion because of an incident that occurred in a conference room in the Matteson office. On September 26, 1996, it is undisputed that a high level manager from Allstate's corporate headquarters, Walter Davis, was reviewing files in a conference room in the Matteson office. (12(M) St. ¶ 43). While he was there, Ms. Thomas, Carolyn Shanette, and then Ms. Smith came into the conference room and had a conversation among themselves. (*Id.*). The events that occurred subsequently are disputed. Ms. Smith denies all of Allstate's allegations.

According to Allstate, during the course of the conversation, Mr. Davis noticed that Ms. Smith became very animated and verbally upset. She became loud and used vulgar language with regard to the company and particular management employees. In particular, Mr. Davis heard Ms. Smith say "Fuck the company. Fuck Sheryl Thomas. I'm going to end up being a disgruntled postal

---

5. The *McDonnell Douglas* burden-shifting test applies to retaliation claims. *Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir.1997). Allstate does not contest the establishment of Ms. Smith's *prima facie* case.

worker." Ms. Smith was upset for about ten minutes and she ranted and raved for about five minutes in such a manner that Mr. Davis believed she was loud enough for anyone in the front part of the building to hear. He was appalled by her behavior and took her reference to postal worker as a reference to work place violence. Mr. Davis immediately tried to report the incident to Mr. Tornabene, the MCM of the office. When he was told that Mr. Tornabene was not in that day, he called his direct supervisor, Gary Mellini, and reported the incident to him. He also called Tom Lilla, the Auto Claim Process Specialist and reported the incident to him. Later, Mr. Davis met with Ms. Bluitt, the CSM, and Mr. Lilla to discuss the incident. He also spoke with Billie Cohen, the Assistant Vice President and Ms. Bluitt's direct supervisor.

The day after the incident, Mr. Lilla called Mr. Tornabene and told him about the incident. Mr. Tornabene then had a telephone conversation with his boss, Ms. Bluitt, about the matter. Mr. Tornabene agreed to discuss the matter with Ms. Thomas to obtain her version of the events and to communicate that her profane comments were not appropriate in the office nor was it professional. Before speaking to Ms. Smith, Mr. Tornabene spoke to the other two women who were in the conference room and witnessed the incident. They confirmed what Mr. Tornabene had been told. Mr. Tornabene then met with Ms. Smith who downplayed the incident and never expressed that she thought there was anything wrong with her outburst. Mr. Tornabene then wrote a summary of his conversation with Ms. Smith, provided a copy to her, placed a copy in her file, and sent a copy to Ms. Bluitt.

Based on his investigation, Mr. Tornabene believed that the incident occurred as reported to him. He felt that the outburst was a clear indication of lack of judgment and a clear statement of Ms. Smith's lack of support for company initiatives and lack of respect for the company's leaders. Because of the incident, Mr. Tornabene decided that Ms. Smith was optimally placed in her current EC position at Allstate. This means that he would not recommend her for a promotion into a leadership position. Mr. Tornabene relayed the above information and his recommendation to Mr. Huber.

Ms. Smith argues that Allstate's stated reason is pretext for retaliation because Allstate did not honestly believe that she engaged in the condemned conduct on September 26. She points to three pieces of evidence to support her argument. First, she claims that Ms. Thomas provided a markedly different account of what occurred. In Ms. Thomas' deposition, however, she merely stated that Ms. Smith was not shouting but that she recalled profanity being used but could not otherwise remember the specifics of the conversation. (Thomas Dep. at 28). Second, Ms. Smith claims that there is no evidence that the incident was taken into account in subsequent promotion decisions. It is undisputed, however, that in the 1997 succession planning form,[6] Ms. Smith was given the lowest rating in four out of five leadership categories. (12(M) St. ¶ 63). Finally, Ms. Smith states that she told Mr. Tornabene that his memo about the incident was not true. Mr. Tornabene was told Mr. Davis' version of the incident, he interviewed the two other witnesses who confirmed Mr. Davis' version, and he spoke to Ms. Smith. He was entitled to make credibility judgments as to who to believe and to conclude that the incident occurred. There is no evidence that Mr. Tornabene reached that conclusion in bad faith. *See McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 799 (7th Cir.1997) ("[I]t is not relevant whether [plaintiff] actually was insubordinate. All that is relevant is whether his employer was justified in coming to that conclusion.... What would be relevant ... is evidence that the employer's estimation of that conduct was not held in good faith and was therefore a pretext for a discriminatory motive."). For these reasons, I do not find Allstate's stated reason for not promoting Ms. Smith on these two occasions pretextual and I grant summary judgment on these claims.

---

**6.** Succession planning is a management process by which managers evaluate individuals for their potential to fill future openings. (12(M) St. ¶ 61).

## Equal Pay Act

■ Ms. Smith alleges that Allstate violated the EPA by paying the following six men more than her for the same work: Mr. Pieroth, Mr. Soskich, Mr. Seal, Mr. Landt, Mr. Nugent, and Mr. Wojicomski. The EPA provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). The statute has a geographic limitation: those employees against whom plaintiff compares herself must work in the same "establishment." See, e.g., Mulhall v. Advance Sec., Inc., 19 F.3d 586, 590 (11th Cir.), cert. denied, 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994). To establish a prima facie case under the EPA, a plaintiff must satisfy the geographic limitation and show that (1) different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions. Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1461 (7th Cir.1994).

■ Allstate initially argues that four of the six employees did not even work in the same establishment as Ms. Smith because they worked in different Allstate offices, and thus, Ms. Smith cannot compare her salary to theirs to show an EPA violation. Although "establishment" is defined by the Secretary of Labor as "a distinct physical place of business rather than ... an entire business or 'enterprise' which may include several separate places of business," 29 C.F.R. 1620.9(a), there are situations where a single establishment can include operations at more than one physical location. Mulhall, 19 F.3d at 591. "[C]entral control and administration of disparate job sites can support a finding of a single establishment for purposes of the EPA. The hallmarks of this standard are centralized control of job descriptions, salary administration, and job assignments or functions." Id.

Viewing the evidence in light most favorable to Ms. Smith, I find that the offices in the Chicago area are a single establishment for purposes of the EPA. Allstate does not dispute that the same pay grades and compensation practices are used throughout the region. Furthermore, there is ample evidence that job assignments, such as promotions, are conducted on a region basis. For example, Mr. Huber, the CSM, is in charge of Matteson, Lombard, Twin Oaks Auto, Oak Brook Central, and Arlington Heights, and makes the final decisions on promotions in this market area. (12(M) St. ¶¶ 76–77).

■ Although Ms. Smith has established the geographic requirement, she has failed to state a prima facie case with respect to Mr. Landt, Mr. Nugent, Mr. Soskich, Mr. Wojicomski, and Mr. Seal. For the first four men, Ms. Smith has not presented any evidence as to their salaries; thus making it impossible to determine whether they make different salaries. Ms. Smith merely asserts that they make more than she does for the same work which is insufficient to survive summary judgment. As for Mr. Seal, the evidence shows that Ms. Smith's salary has exceeded Mr. Seal's since at least March 1, 1994. (Buban Supp. Aff. ¶ 3, Def.'s Reply Ex. B).

■ The only remaining person is Mr. Pieroth. Mr. Pieroth became an EC in the Matteson office after he was asked to step down from his position as CCM. Although the EC position is a salary grade 35 position, Mr. Pieroth was paid at a salary grade 37, his pay level as a CCM. During the same time period, Ms. Smith was an EC who was paid at a salary grade 35. Thus, Ms. Smith has established her prima facie case.

■ Allstate claims that although Mr. Pieroth was paid more than Ms. Smith for the same work, the pay difference was the

result of Allstate's policy of red circling and not because of sex. Pursuant to this policy, when an employee is reassigned from a higher graded position to a lower one, the employee's salary is not reduced. Rather, an employee's salary is frozen until such time as the employee's salary falls within the range of the lesser salary grade to which the employee is assigned. In this manner, when Mr. Pieroth stepped down from his CCM position to become an EC, his salary was frozen at the CCM grade 37 level and not reduced to the EC grade 35 level.

The court must accept this sex-neutral defense unless the policy was not used or applied in good faith, *i.e.*, it was not bona fide, it was discriminatorily applied, or it had a discriminatory effect. *See Fallon v. State of Ill.*, 882 F.2d 1206, 1211 (7th Cir.1989). Ms. Smith contends that the policy was not applied in good faith because Mr. Seal and Mr. Pieroth were not reclassified but were demoted, and thus their salaries should not have been red circled. As already noted, Mr. Seal's salary is not evidence of an EPA violation because he did not make more than Ms. Smith. As for Mr. Pieroth, even if he was demoted, Ms. Smith has not presented any evidence that female employees who were asked to step down did not also have their salaries red circled. Ms. Smith needs to present some evidence of discriminatory application or effect based on sex.[7]

### Conclusion

Allstate's motion for summary judgment is granted.

---

7. In Ms. Smith's complaint, she alleges that non-African Americans and men are paid more than her for the same work in violation of Title VII. To the extent that she is claiming discrimination in pay under Title VII, those claims also fail for the same reasons the EPA claims fail.